# Richmond

CHRISTIAN E. GUDEBROD v. ARTEMAS WARD'S ADMINISTRATOR, TURKEY KNOB ORCHARD, INC., ET AL.

November 14, 1935.

Present, All the Justices.

The opinion states the case.

*F. S. Tavenner,* for the appellant.

*H. S. Larrick, E. W. Kemp, Jr.,* and *R. Gray Williams,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

The petition and record in this case consists of nearly 4,000 printed pages, divided into eight large volumes, a great proportion of which is entirely irrelevant to the issues presented. The record contains page after page of colloquies between counsel, the rambling and argumentative statements of witnesses, the same exceptions repeated over and over, excerpts from other records, and numerous reports of accountants dealing with the same subject matter. The pertinent facts, sandwiched as they are between so much superfluous matter have been difficult and tedious to weed out. In this burdensome task we have received much aid from the well-prepared briefs and the two excellent opinions of the trial judge.

The records show that on March 23, 1911, Artemas Ward and C. E. Gudebrod entered into a formal written contract, which was later somewhat amended. Under the terms of the contract, as amended, it was agreed that a corporation should be organized for the purpose of acquiring certain orchard lands in Shenandoah county, at the price of $210,400. Artemas Ward agreed: (1) to lend to the corporation $20,000 for working capital; (2) to advance the purchase money for the orchard lands except $50,000, which might be continued as a mortgage on the property under the contract of purchase; (3) to pay for the entire issue of capital stock of $50,000, divided into 500 shares of the par value of $100 each.

Two hundred and fifty shares of stock were to be issued to Gudebrod, who was immediately to transfer them to Ward, on condition that out of the net earnings dividends

were to be declared annually on the stock. Seventy-five per cent of each dividend was to be used to reimburse Ward for money advanced for the stock, with six per cent interest, and to pay off the debt due Ward, or other creditors, until the total debts due by the corporation were reduced to $50,000. When Ward was reimbursed, both as to principal and interest, for moneys advanced for the payment of the capital stock, and when all indebtedness of the corporation was reduced to $50,000, then the 250 shares of stock were to be transferred to Gudebrod.

. Ward reserved the right to name all officers and directors for the first year and until their successors were elected and qualified. Gudebrod was to be manager and was to receive a salary out of the net earnings.

Pursuant to this contract, a charter for Turkey Knob Orchard, Inc., was duly obtained from the Corporation Commission of Virginia, upon the application of Gudebrod and others, and on May 11, 1911, the charter became effective. The initial meeting of subscribers to capital stock was held on June 17, 1911, and six days later the first meeting of directors was held at the corporation's business office in New York. Gudebrod was present at both meetings and was elected president and general manager. Stock was issued in accordance with the terms of the contract. Gudebrod, with the assent of Ward, placed one share of stock to be issued to him in the name of one George H. Sullivan, and transferred the other 249 shares to Ward. Ward placed several shares in the names of others, and held 246 shares in his own name. Evidently the placing of the few shares in the names of others enabled the holders to qualify as directors, and thereby equip a sufficient number of directors as share-holders as the law required.

At this meeting of directors the contracts for the purchase of the orchard lands were reviewed at length, and title to the property taken in the name of the corporation. The directors approved the offer of Ward to lend the corporation money as it needed it, not to exceed the sum of

$200,000, and authorized the president and secretary to execute bonds as the money was advanced bearing six per cent interest and secured by a mortgage, or trust deed, on the properties of the corporation. George M. Clarke, a director, was instructed to prepare such a mortgage, or trust deed, and submit the same for approval to Robert T. Barton, an attorney, of Winchester, Va.

By another resolution Gudebrod's salary as manager was fixed at $2,500 per year, payable out of net earnings, and five per cent commission on net sales. This resolution further provided that Gudebrod should be entitled to an increase in salary, if and when the net earnings exceeded $40,000 per year. Ward paid into the corporation the $50,000 for capital stock, and advanced to the corporation $150,000. $130,000 of this loan was used in payment of the purchase price of the lands, and $20,000 as working capital.

Prior to 1915, Gudebrod managed the corporate affairs from New York, his place of residence, with a local manager in charge, to whom was paid an annual salary of $1,500. In 1915, at Gudebrod's suggestion, he was authorized to move on the orchard lands in Virginia. The services of the local manager were discontinued, his compensation was paid to Gudebrod, who was allowed an additional increase in salary and commissions, the exact amount of which is in dispute. At any rate Gudebrod, for all practical purposes, had the exclusive management of corporate affairs from 1911 to 1925.

While Ward was not under any contractual obligation with Gudebrod, to lend any additional sums to the corporation, during the thirteen years prior to the institution of this suit he advanced additional funds required to operate the orchard amounting to $189,589.85. Of the principal sums advanced, he was repaid from time to time, $104,375.75, which did not include an adjustment of interest. These payments left the corporation due and owing to Ward the principal sum of $235,214.08, evidenced by two notes, one dated April 2, 1921, payable on demand to Artemas Ward,

in the sum of $10,000; the other dated December 31, 1924, payable on demand to Artemas Ward, in the sum of $225,214.08. While Artemas Ward in thirteen years had paid into the treasury of the corporation in excess of what he had received, the sum of $285,214.08, which included the payment for the capital stock, Gudebrod, who was under no obligation, and did not pay one dollar of outside capital into the treasury of the corporation, during the same period withdrew therefrom in salary, and commissions, more than $75,000. This was approximately the situation on May 2, 1924, when Mr. Ward wrote Mr. Gudebrod the following letter:

"My dear Mr. Gudebrod:

"I have come to a final conclusion that I should discontinue the Turkey Knob undertaking, and in order to do so promptly and amicably I will ask you to resign the position as president and any claims you may technically have on it.

"I have no doubt that after careful consideration of all the circumstances you will be willing to do this in justice to me in view of the thirteen years in which I have extended my investment until the company is now indebted to me for $223,714.08, an amount exceeding its total assets, and exceeding by four times the capital stock of the company.

"I enclose for your information a general statement which shows that I have received no returns during the thirteen years, and that you have received in salary and commissions $73,019.80.

"I will pocket my losses, and if I can settle this matter promptly and amicably the expense and trouble will be lessened to me, and you can rely upon it that I will settle all just accounts so as to avoid a bankruptcy and receivership, which would otherwise be necessary.

"Yours very truly,
"(Signed) Artemas Ward."

This letter marked the end of the harmonious business relations between Ward and Gudebrod. Gudebrod re-

fused or failed to comply with the request that he resign as president and permit a dissolution of the corporation without incurring the expense of a receivership. An attempt was made, with the consent of Gudebrod, to sell all assets of the corporation, but no sale was consummated. A second called meeting of the board was held on January 21, 1925, with Gudebrod presiding, and with his assent, a committee of experts was appointed to make an examination of the properties and report thereon.

This committee went on the lands, made an examination and survey of the orchards and equipment, and submitted a written report at the next meeting of the directors, held February 21, 1925. The substance of this report was, that the corporate affairs had not been efficiently and judiciously managed; that the orchards were not in as good condition as they should have been; that it was necessary to make an additional expenditure of large sums of money, and even then it would be three years before the orchards could be put in proper shape, and a reasonable profit on a fair valuation realized therefrom.

At this meeting Gudebrod was relieved of his duties as manager, and a few days later removed from the office of president. Gudebrod refused to vacate his office as manager, and to permit Mr. Clarke, the manager elected by the board in his stead, to take charge of the corporate property. This situation created utter confusion in the business affairs of the corporation.

On March 12, 1925, Artemas Ward, as creditor, and four of five directors of the corporation, filed the bill in this cause against the corporation and C. E. Gudebrod, alleging the facts stated above and making other material allegations, praying that a receiver be appointed for the insolvent debtor, and that the corporation be dissolved. On March 14, 1925, Artemas Ward died, and the case was revived in the name of his administrator.

To this bill Gudebrod filed his answer, and a lengthy cross-bill. In the cross-bill it was alleged that the corporation was not insolvent; that it was due Gudebrod a

large sum for salary and commissions which he had not withdrawn; that the board of directors had no right to remove him as president and general manager; that he was entitled to unlimited time in which to comply with the condition whereby he would be entitled to a return of the 249 shares of stock that he had previously assigned to Ward; that his management of the orchards was extremely efficient and judicious, and praying that the board of directors be enjoined from interfering with him in the management of the orchards.

Over Gudebrod's protest, receivers were appointed, and for the past ten years have been conducting the business of the corporation under the supervision of the court in this cause, and only a very small proportion of the debts due by the corporation have been paid. Notwithstanding this fact Gudebrod's first assignment of error is that the chancellor below was in error in holding that the Turkey Knob Orchard, Inc., was insolvent on the date this suit was instituted.

It was established that in March, 1925, the corporation was due Ward's estate the principal sum of $235,-214.08, interest at six per cent on this amount from the dates the different sums were received by the corporation, as calculated by the trial judge, was found to be $174,268.04. The corporation was due other parties the sum of $50,000, secured by a first mortgage on its lands. It was conceded the corporation owed other debts on open account totaling several thousand dollars and Gudebrod himself claimed that the corporation owed him $95,973.67. These sums show a total liability of more than $575,000, including the capital stock. Even Gudebrod, with all of his optimism, did not claim that the value of the total assets exceeded $525,000; other more conservative witnesses placed the value of the properties at from $150,000 to $200,000. While the trial judge did not approve the full amount of Gudebrod's claim, there is no doubt of the fact that the corporation was, and is, insolvent.

Appellant's second assignment of error is thus stated:

"The court erred in decreeing that Gudebrod at the institution of the suit possessed no interest as stockholder in the company, and erred in not declaring the conversion of petitioner's stock to be unlawful."

The trial court's analysis of, and conclusion from, the evidence on the point is so clear and convincing, that we are content to adopt them as our own without further comment. Judge Philip Williams stated his views thus:

"The financial statement of the corporation for the calendar year of 1924, the last before this litigation began, shows a deficit of $151,272.77 in the surplus account. By this statement the liabilities exceeded the assets by the sum of $101,272.77. Only the principal sum of $235,214.08 of the debt of Artemas Ward is included in the liabilities, no interest on this debt is charged in the statement. If interest at six per cent be charged on this debt and added to the liabilities, these would be increased by the sum of $174,268.96.

"Into this statement enters a charge for depreciation on the property of the corporation. The entire amount charged for depreciation from the inception of the corporation in 1911 to December 31, 1924, is $156,831.25. The deficit accumulated during the same period was $151,-272.77. Therefore if the depreciation were eliminated from consideration, the earnings for the period mentioned would be the sum of $5,558.51.

"Now the condition upon which C. E. Gudebrod would be entitled to one-half of the stock of the corporation was this: That out of seventy-five per cent of dividends declared on the entire capital stock there should be repaid to Artemas Ward the $50,000 he had paid for the capital stock, with interest thereon at six per cent, and the amount of all debts due him by the corporation with like interest. Not until these sums had been paid was C. E. Gudebrod to become the owner of the stock.

"The principal of the loans of Artemas Ward to December 31, 1924, was the sum of $235,214.08. The interest as of this date amounted to $174,268.96. The total of prin-

cipal and interest was $409,483.04. Add to this total, $50,000 for the capital stock purchased by Artemas Ward, plus the accrued interest thereon amounting to $58,690 to December 31, 1924, and the total sum is $518,173.04. This, then, is the sum that must be paid to Artemas Ward from seventy-five per cent of the dividends on the capital stock of Turkey Knob Orchard, Inc., before one-half of that stock can become the property of C. E. Gudebrod.

"To draw a conclusion upon this issue from the foregoing, it may be considered that the operations of the corporation for thirteen years produced a deficit of $151,-272.77, and that even though the amount charged off for depreciation be eliminated from consideration, so as to exclude the dispute over the proper amount of depreciation, the entire earnings for this period were only $5,558.51. Taking either of these results of the operations as a criterion upon which to judge of the expectation for continuation of operation, and it seems certain that the condition upon which depends the ownership of stock by C. E. Gudebrod cannot be filled.

"Other calculations have been made based on the history of the operations of this corporation, the productive life of the orchards, and the amount required to be paid to Artemas Ward before C. E. Gudebrod is entitled to one-half of its stock. All of them have brought the court to this same conclusion. Take into consideration the fact that these orchards have a limited profitable production life; that thirteen years of that life had been consumed in producing the results named at the time this suit was brought; and the possibility that the orchards could, in the remaining productive life left to them, produce enough so that from earnings this large sum of money, with accruing interest, could be repaid, appears indeed a remote possibility. On the contrary it seems a practical certainty that there is no reasonable ground for such expectation.

"The evidence seems to show that not only can the purpose of this contract between Artemas Ward and C. E.

Gudebrod not be achieved within a reasonable time, but that it cannot be achieved at all. Therefore, a continuation of this enterprise would gain nothing for the defendant, C. E. Gudebrod, by way of earning stock in the corporation, but would result in loss in value of the orchards as their production decreased from age, loss of interest accruing on the indebtedness to Artemas Ward, the hazard of further loss from operation. A court of equity should not by its decree require this.

"It therefore follows from the foregoing conclusions that, in the opinion of the court, C. E. Gudebrod has no equity in one-half of the capital stock of Turkey Knob Orchard, Inc., and no right to have the operation of the corporation continued under his management; and that his employment by the corporation was terminated by the resolution of the board of directors at the meeting of February 26, 1925."

The third assignment of error is, that "Artemas Ward was not entitled to a lien of $150,000 decreed by the court, or any part thereof, as a lien, with priority over Gudebrod.

Gudebrod did not deny that under the contract of March 23, 1911, and by virtue of a resolution of the board of directors of Turkey Knob Orchard, Inc., Ward was entitled to a lien to secure the large sums he had advanced to the corporation, but he contends that Ward agreed to waive the security of the lien by a mortgage or trust deed, and he relies upon his own testimony to establish the agreement to waive. As Ward was dead, the uncorroborated testimony of the other party to the transaction is not sufficient to support a decree in his behalf. (See Code, section 6209). Again we find that Judge Williams made an excellent summary of the evidence on the point thus:

"It has been decided that the estate of Artemas Ward is entitled to an equitable lien upon the property of Turkey Knob Orchard, Inc., to the extent of a portion of the indebtedness.

"In the agreement between Artemas Ward and C. E. Gudebrod of March 23, 1911, when they agreed to enter

into this enterprise, it was provided that Artemas Ward should be secured by a mortgage upon the entire orchard lands and properties purchased by the corporation for the repayment of all loans which he therein obligated himself to make, with interest thereon at six per cent. It was likewise provided by resolution of the board of directors of Turkey Knob Orchard, Inc., at the first meeting held after the organization of the corporation, on June 23, 1911. Moreover, it was provided in both of these documents that this lien was to be prior to all other liens except any purchase money lien which it might be decided to place against the property.

"It therefore clearly appears to have been the purpose of both Artemas Ward and C. E. Gudebrod, from the very inception of this enterprise, that Mr. Ward should have this lien for his protection in the eventuality of disaster. Mr. Gudebrod no doubt considered this provision just, inasmuch as Artemas Ward was putting up all of the money for the capital of the corporation and was loaning money to purchase the orchards and to operate them.

"The resolution of the board of directors authorizing the creation of this lien accepted the offer of Artemas Ward to lend the corporation the sum of $150,000, as and when needed for the payment of deferred purchase money installments on the orchards and for operating capital. It provides that bonds of the corporation shall issue for each advancement of funds. It directs that an advance money mortgage or deed of trust upon the property of the corporation be executed by its officers to secure the payment of these bonds.

"A deed of trust was actually prepared as directed by this resolution, but was never executed.

"It is the contention of C. E. Gudebrod that the right to have this lien was waived by Artemas Ward. This contention is not proven. The agreement for this lien was a valuable contractual right. Upon it depended the security of $150,000. It is not probable that Artemas Ward would lightly relinquish this right. It does appear that

he did not, apparently, insist on the execution and recordation of this deed of trust. But the reason for this course appears to have been because of the necessity of renewing the purchase money lien of $50,000 upon the real property of the corporation. This debt remained unpaid and the corporation at least twice issued bonds secured by a first lien deed of trust to provide for its payment. The exercise of the right was deferred rather than waived.

"The court is therefore of the opinion that the estate of Artemas Ward is entitled, under the settled principles of equity, to a lien upon the property of the Turkey Knob Orchard, Inc. It was so contracted, and equity in such cases will treat that as done which was intended to have been done.

"This lien, however, should not include the entire indebtedness. It should be confined to the debt contemplated by the directors' resolution. That debt was $150,-000 and interest. But it has been concluded that the lien cannot extend to that full amount, because repayments from Turkey Knob Orchard, Inc., to Artemas Ward had reduced the total of the principal due him to the sum of $122,175.40 as of the year 1920. Therefore the lien should be for this principal sum and for interest as provided in the resolution referred to. It is desired that a statement computing and adjusting the interest shall be submitted to the court and made a part of the record.

"It follows that as to the balance of the indebtedness due from Turkey Knob Orchard, Inc., to Artemas Ward, no lien exists, and the same is an unsecured debt against the corporation.

"It is of course not intended that this equitable lien shall entitle the debt secured thereby to a priority over any creditor of Turkey Knob Orchard, Inc., other than C. E. Gudebrod. But if it is shown that the corporation is indebted to him then this lien debt and the interest thereon is entitled to payment from the assets of the corporation in priority to his debt."

Gudebrod's main contention seems to be, that under the contract of March 23, 1911, as amended and acted upon by the parties, he and Ward became engaged in a joint adventure, by reason of which Ward was obligated to continue indefinitely to make advances of indefinite sums to the enterprise, and that by his failure to do so, and his failure to permit Gudebrod to stay in charge of operations, Gudebrod has suffered damages, which he is entitled to recover, in some form, from Ward or the corporation.

In view of the pertinent evidence such a contention hardly deserves consideration. However the contract may be construed, it is clear that a corporation was contemplated and actually chartered, under which the enterprise was to be conducted. The corporation, as formed, became subject to the general laws of the State. Gudebrod, during a period of thirteen years, accepted the offices of director, president, and general manager, presided at the meetings of stockholders and directors, and signed the minutes and various reports required by law. The only objection to the corporation, as such, was raised after he had been removed by a resolution of directors duly elected by the stockholders. Such objection, even if there were any merit therein, comes too late.

To epitomize the evidence on the other part of his contention, we have: (1) Ward, at Gudebrod's suggestion, for a period of thirteen years made advances for the benefit of the enterprise, very much in excess of the amount specified in the contract; (2) The corporation under Gudebrod's management became wholly insolvent; (3) In 1924, when Ward became convinced of the insolvency of the corporation, he frankly informed Gudebrod of that fact, and stated that he would make no further advances, and suggested an inexpensive procedure to dissolve the corporation, and end the undertaking; (4) Gudebrod declined to assent to this suggestion, but did agree that all the corporate assets be sold, and was given a reasonable time to consummate such a sale; and (5) Gudebrod had received for his services more than $75,000, without the investment

of any capital, yet he refused to surrender possession of the property to his duly elected successor.

Even if we construe the contract as Gudebrod contends, Ward was under no obligation to continue an insolvent corporation at his own personal expense. "Where it becomes evident that a further advance of funds to an adventure will only entail further losses, a party to a joint adventure is not bound to go on with the adventure and is not liable in damages for a failure to do so." 15 R. C. L. 506.

Several hundred pages of the record and briefs are devoted to the amount claimed by Gudebrod to be due him for salary, commissions and expenses. The entries made in the books of the corporation were known to the president and general manager. Itemized statements of his accounts were sent him from time to time. To these statements he occasionally objected, which objections were explained or corrected. In the correspondence between him and Ward, it clearly appears that Ward was very generous in allowing increases in salary, payment of back salary, and commissions not authorized by the corporation. However, according to Gudebrod's own statement, he allowed the sums of money which he now claims to be due him to remain in the treasury of the corporation without demanding payment therefor until after this controversy arose, and with full knowledge that the corporation was under a written obligation to give Ward a lien on all its properties for the large sums advanced by him.

The trial court, after a careful analysis of the mass of evidence on this contention, reached the conclusion that Gudebrod as a general creditor was entitled to recover from the corporation as of March 12, 1925, $19,782.49 principal, and $10,968.84 interest, or a total of $30,751.33. The payment of this sum was held to be subordinate to the payment of the amount of the equitable lien in favor of Ward's estate, and to participate *pro rata* with other creditors, who had knowledge of the equitable lien.

In this holding of the trial court, we find no error prejudicial to the rights of Gudebrod, and inasmuch as the present value of all the assets of the corporation are not sufficient to discharge the equitable lien, which, with interest, the court found to be $333,705.03, a review of the court's ruling on the amount of the claim would be purely academic. The questions raised by the other assignments of error are either academic, or so elementary, that they do not merit consideration.

For the reasons stated, the decrees from which this appeal was allowed will be affirmed.

*Affirmed.*